## Barry v.
## State Medical Board
*[Cite as 6 AOA 293]*

*Case No. 89AP-689*
*Franklin County, (10th)*
*Decided August 30, 1990*

*James M. Hall, Jr., Taft, Stettinius & Hollister,*
*for Appellee.*

*Anthony J. Celebrezze, Jr., Attorney General, and*
*John C. Dowling, for Appellant.*

BOWMAN, J.

In 1981, after graduating from the physicians' assistant program at the Kettering College of Medical Arts, Joel C. Ashenbaum ("Ashenbaum") became employed with appellee, James H. Barry, M.D. ("Dr. Barry"), in a family practice rotation. Around this same time, Ashenbaum mailed a copy of his diploma and transcript to appellant, the Ohio State Medical Board ("board"), along with' a letter expressing his interest in being registered as a physician's assistant. Upon passing the examination given by the National Commission on Certification of Physicians' Assistants, Ashenbaum forwarded this information to the board in early 1982. Ashenbaum received no response from the board, but assumed he was registered and the licensing certificate would be forwarded to Dr. Barry and not to him personally. Ashenbaum, who was at all times a registered nurse, remained employed with Dr. Barry and in the spring of 1987, learned that he was not properly registered as a physician's assistant by the board. That Ashenbaum was not registered came to light when he attempted to apply for a provider number for purposes of Medicare billings and not through any complaints as to the quality of his services. He thereupon contacted the board and was advised to fill out an application. Ashenbaum and Dr. Barry completed and filed an application for registration as a physician's assistant in May of 1987.

On February 10, 1988, the board notified Dr. Barry by letter that they intended to "*** determine whether or not to limit, revoke, suspend, refuse to register or reinstate *** " his certificate to practice medicine due to the circumstances surrounding his employment of Ashenbaum as a physician's assistant without Ashenbaum being registered.

On June 27, 1988, the board held a consolidated hearing for Dr. Barry and Ashenbaum. On July 27, 1988, the attorney hearing examiner issued a report and recommendation in the matter of Dr. Barry and Ashenbaum. With regard to Dr. Barry, the hearing examiner found Dr. Barry's conduct in employing Ashenbaum "*** without obtaining the prior approval of the State Medical Board constitutes a violation of 4730.02(C) ***" of the Ohio Revised Code. The hearing examiner also found Dr. Barry aided and abetted Ashenbaum in violating R.C. 4731.41, practicing medicine without a license. In aiding and abetting Ashenbaum, the hearing examiner found Dr. Barry violated R.C. 4731.22(B) (16) (effective prior to March 17, 1987), and R.C.

4731.22(B)(20) (effective on or after March 17, 1987). The hearing examiner therefore recommended that Dr. Barry's license to practice medicine and surgery be suspended for thirty days.

With regard to Ashenbaum, the hearing examiner found Ashenbaum acted as a physician's assistant without ever being licensed, violating R.C. 4730.05(B), 4730.05(P), 4730.06(A) and 4731.41, although the examiner found no fraud or intent to deceive on the part of Ashenbaum. Ashenbaum was also found to have violated R.C. 4730.03(A), application for certificate of registration fee, and Ohio Adm. Code 4731-4-02(B), with regard to the billing system. As a result, Ashenbaum's application for registration as a physician's assistant was ordered denied.

On September 14, 1988, the board adopted the hearing examiner's report but modified the recommended discipline and issued an order suspending Dr. Barry's license to practice medicine and surgery for seven days and ordering Dr. Barry not to employ Ashenbaum as a physician's assistant until he was properly registered.

Dr. Barry appealed the board's order to the Franklin County Court of Common Pleas. On January 26, 1989, oral argument was heard by a referee. On April 14, 1989, the referee rendered a report recommending the board's order be reversed, finding the board's decision is not supported by "*** reliable, probative, and substantial evidence and is not in accordance with law. ***" The trial court adopted the referee's finding and reversed the order of the board suspending Dr. Barry's license to practice medicine.

The board appeals, asserting the following assignments of error:

"I. THE COURT OF COMMON PLEAS ERRED BY RULING THAT THE BOARD'S ORDER IS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE AND IS NOT IN ACCORDANCE WITH LAW.

"II. THE COURT OF COMMON PLEAS ERRED IN INTERPRETING R.C. 4731.34 CONCERNING THE DEFINITION OF THE PRACTICE OF MEDICINE.

"III. THE COURT OF COMMON PLEAS ERRED IN INTERPRETING R.C. 4723.06 AND BY RULING THAT ASHENBAUM DID NOT PERFORM ANY ACTS BEYOND THE SCOPE OF THIS LICENSURE AS A NURSE."

Appellant's assignments of error are related and will be discussed together.

The Ohio Supreme Court set forth the standard of review in appeals, pursuant to R.C. 119.12, in *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St. 2d 108, at 110:

"In *Andrews v. Bd. of Liquor Control* (1955), 164 Ohio St. 275, paragraph one of the syllabus, this court held that a Court of Common Pleas must, in an appeal pursuant to this section, appraise all the evidence 'as to credibility of witnesses, the probative character of the evidence and the weight to be given it, and, if from such a consideration it finds that the [administrative] order is not supported by reliable, probative, and substantial evidence and is not in accordance with law, the court is authorized to reverse, vacate, or modify the order ***.' ***"

Therefore, the issue before the board was whether Dr. Barry employed Ashenbaum as a physician's assistant without prior approval of the board and, by doing so, assisted and abetted Ashenbaum in practicing medicine without a license. The trial court was then presented the issue of whether the board's finding was supported by substantial, reliable and probative evidence and was in accordance with the law.

The issue presented to us is whether the trial court abused its discretion in finding that the board's order was not supported by substantial, reliable and probative evidence and was not in accordance with the law. *Hartzog v. Ohio State Univ.* (1985), 27 Ohio App. 3d 214.

The trial court expressly adopted the findings of the referee and found that the board's decision suspending Dr. Barry's license to practice medicine for seven days was not supported by reliable, probative and substantial evidence and was not in accordance with law.

The board had ordered that Dr. Barry's license be suspended pursuant to R.C. 4731.22(B), which delineates the grounds for discipline. At the outset, it must be noted that neither the Ohio Revised Code nor the Ohio Administrative Code sets forth a penalty to be imposed on a physician for violating R.C. 4730.02(C), employing an unlicensed physician assistant. Therefore, in order to impose the penalties prescribed by R.C. 4731.22, the board had to first find that Ashenbaum was practicing medicine without a license under R.C. 4731.41 and, that by employing Ashenbaum, Dr. Barry aided and abetted the unlicensed practice of medicine.

Assuming, *arguendo*, Dr. Barry violated R.C. 4730.02(C) by employing Ashenbaum as a physician's assistant without being certified, this does not necessarily mean, as a matter of law, that Dr. Barry aided Ashenbaum in practicing medicine without a license, especially in light of the fact that Ashenbaum was a registered nurse.[1] The statutes involving physicians' assistants and persons practicing medicine are separate and distinct.

R.C. Chapter 4730 deals with physicians' assistants. R.C. 4730.01 provides that:

"(A) 'Physician's assistant' means a skilled person qualified by academic and clinical training to provide services to patients under the supervision and direction of a licensed physician or group of physicians who are responsible for his performance." R.C. Chapter 4731 defines the practice of medicine. R.C. 4731.34 provides in pertinent part:

"A person shall be regarded as practicing medicine, surgery, podiatry, or midwifery, within the meaning of sections 4731.01 to 4731.60, inclusive, of the Revised Code, who uses the words or letters, 'Dr.,' 'Doctor,' 'Professor,' 'M.D.,' 'D.S.C.,' 'Pod. D.,' 'M.D.,' or any other title in connection with his name which in any way represents him as engaged in the practice of medicine, surgery, podiatry, or midwifery, in any of its branches, or *who examines or diagnoses for compensation of any kind*, or prescribes, advises, recommends, administers, or dispenses for compensation of any kind, direct or indirect, a drug or medicine, appliance, mold or cast, application, operation, or treatment, of whatever nature, *for the cure or relief of a wound, fracture or bodily injury, infirmity, or disease*, provided that the treatment of human ills through prayer alone by a practitioner of the Christian Science church, in accordance with the tenets and creed of such church, shall not be regarded as the practice of medicine; and provided further that sanitary and public health laws shall be complied with, and that no practices shall be used which may be dangerous or detrimental to life or health and that no person shall be denied the benefits of accepted medical and surgical practices." (Emphasis added.) Under R.C. 4731.34, a person will be considered as practicing medicine if he either examines or diagnoses, or prescribes or dispenses medication, for compensation and for the cure or relief of a wound, fracture or bodily injury, infirmity, or disease.

The term "diagnosis" is defined in Black's Law Dictionary, (5 Ed. 1979) 408, as:

"A medical term, meaning the discovery of the source of a patient's illness or the determination of the nature of his disease from a study of its symptoms. The art or act of recognizing the presence of disease from its symptoms, and deciding as to its character, also the decision reached, for determination of type or condition through case or specimen study or conclusion arrived at through critical perception or scrutiny. A 'clinical diagnosis' is one made from a study of the symptoms only, and a 'physical diagnosis' is one made by means of physical measure, such as palpation and inspection." Thus, a diagnosis involves determining the cause of an illness and recommending a corresponding treatment, not just the collection of data, which is apparently much of what Ashenbaum did. Diagnosis involves the collecting of facts and then arriving at a conclusion based on the data collected. The only evidence relating to Ashenbaum's activities does not fit within the plain meaning of "diagnosis" and hence, did not violate R.C. 4731.41.

The evidence the hearing examiner and board relied on was based primarily on Dr. Barry's testimony as to Ashenbaum's activities:

"He can see the patient, make an evaluation but not a diagnosis. He can order tests. He can also administer medications that have already been approved. In other words if we have a criterion for an ear infection or a sore throat, he can issue medications for that. He can do dictation work. He reviews all of the charts, all of the lab tests that come back, makes sure they're in the chart and the patients are notified of what their lab tests are. If another examination, say one's cholesterol is high, he will notify them of that fact and make arrangements to get further testing on them or give them counseling on diet, none of which that part is reimbursable." The hearing examiner also referred to Ashenbaum's testimony that he performed cursory physical examinations and screening of patients. Based on the aforementioned testimony alone, the board found Dr. Barry assisted and abetted Ashenbaum in practicing medicine without a license for which his license was suspended under R.C. 4731.22.

The record shows Dr. Barry specifically stated that Ashenbaum could not make a diagnosis; however, the board argues that Dr. Barry allowed Ashenbaum to order tests based on information he obtained from physical examinations and that this necessarily involved diagnosing the patient "*** for the cure or relief of a wound, fracture or bodily injury, infirmity, or disease

***." R.C. 4731.34. Although Ashenbaum may have ordered tests, there is no evidence that he was prescribing treatment or made any conclusions or recommendations for treatment based on those test results, he was merely carrying out Dr. Barry's prior approved orders.

The board relies on the cases of *Mirsa v. State Medical Board* (1975), 42 Ohio St. 2d 399; and *State v. Rich* (1975), 44 Ohio St. 2d 195, in support of its argument.

However, these cases involve specific acts and are easily distinguishable from the limited set of facts presented here. In *Rich, supra,* the particular act constituting the practice of medicine was acupuncture, which involves inserting needles beneath the skin to alleviate pain or disease. In *Mirsa, supra,* the technique at issue involved plasmapheresis, which is taking blood plasma from donors, processing it and returning the isolated cells to the donor. The process is repeated until a sufficient amount of plasma is obtained which is then sold to pharmaceutical firms. The process also involves giving the donor a physical examination for the purpose of evaluating whether the person will qualify as a suitable donor. Upon completion of the process, the donor may be injected with tetanus toxoid to produce an antibody which can later produce an immune globulin for use in treating tetanus. This was all done without the supervision of a licensed physician. Based on this complicated procedure, the Ohio Supreme Court concluded that this constituted the practice of medicine within R.C. 4731.34. The court found in pertinent part, in *Mirsa, supra,* at 402:

"Appellant's procedures include the initial in depth medical history and a physical examination consisting of a series of tests outlined in the above statement of facts. From the medical history and results of these tests, appellant must evaluate whether the prospective donor is acceptable. This determination necessarily involves a diagnosis of the donor's current health on the basis of a medical examination. Medical decisions also arise in the return of the isolated blood, cells, and in the injection of the tetanus toxoid."

The board somehow argues that Ashenbaum must have been diagnosing the patients he was physically examining for the purposes of ordering diagnostic tests; however, again the board has not pointed to any particular evidence where Ashenbaum diagnosed a patient, *i.e.,* determined the source and nature of the illness, and accordingly ordered a test based on that diagnosis. There is simply not sufficient evidence to show any acts Ashenbaum performed fell within the practice of medicine. The testimony of Dr. Barry, which was unrefuted, in and of itself gives a description of Ashenbaum's activities, in which he specifically states Ashenbaum could not diagnose. His activities were to be supervised by Dr. Barry, with Dr. Barry making the medical judgments.

Although the board suggests that Ashenbaum must have performed every act he checked in his application for a physician's assistant he submitted in 1987, there is no evidence substantiating such allegation. In fact, the application specifically asks the applicant to check those tasks he intends to perform in the future. We cannot assume Ashenbaum actually performed all these tasks. The board is merely conjecturing as to Ashenbaum's activities. There is no evidence he performed any acts that a registered nurse could not do.

A conviction for practicing medicine or surgery cannot be predicated on general principles or mere suspicion, but must be predicated on probative evidence of every material element which is necessary to constitute the crime. *State v. Winterich* (1952), 157 Ohio St. 414.

Further, as the trial court found, there is no evidence showing Ashenbaum did anything beyond what he was authorized to do as a registered nurse. Although a nurse can be found to have practiced medicine without a license, pursuant to R.C. 4731.41, there is not sufficient evidence to support such a finding with regard to Ashenbaum. The board relies on *Richardson v. Doe* (1964), 176 Ohio St. 370, in its assertion that Ashenbaum went beyond his scope as a registered nurse.

It is important to keep in mind that *Richardson, supra,* describing the practice of nursing, was decided almost twenty years before Ashenbaum began working for Dr. Barry and that nurses have continued to be given broader authority over the years.[2] Even so, there is not sufficient evidence that Ashenbaum went beyond the scope of nursing set forth in *Richardson.* The court in *Richardson* stated, at 373, that "*** [a] nurse is not permitted to exercise judgment in diagnosing or treating any symptoms which the patient develops. *** Any treatment or medication must be prescribed by a licensed physician. ***" The court, in *Richardson,* was especially concerned with and stressed the fact that a nurse is prohibited from exercising independent judgment in the areas of diagnosis and prescription.

As previously mentioned, the record reveals that Dr. Barry specifically stated that Ashenbaum could not make a diagnosis and only ordered prescriptions that he himself had previously authorized. Contrary to the board's assertion, there is no direct evidence that Ashenbaum made any independent medical judgment for the purpose of prescribing medication or recommending treatment. There is likewise no evidence that the physical examinations he performed at the Otterbein Nursing Home were an examination for the "cure or relief of a wound, fracture or bodily injury, infirmity, or disease" as required by R.C. 4731.34.

Since the specific facts of this case do not prove Ashenbaum did anything which constitutes a violation of R.C. 4731.41 or beyond the scope of his licensure as a registered nurse, the board improperly imposed a penalty under R.C. 4731.22 on Dr. Barry for assisting and abetting Ashenbaum with practicing medicine without a license in violation of R.C. 4731.41.

Thus, the trial court did not abuse its discretion in finding that the board's order was not supported by reliable, probative and substantial evidence.

For the foregoing reasons, appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY, P.J., concurs.
MAHONEY, J., dissents.

MAHONEY, J., retired of the Ninth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.

MAHONEY, J., dissenting.
Being unable to agree with the majority, I must respectfully dissent. I would affirm the board and reverse the trial court which I feel may not have applied the correct standard of review.

---

[1] We specifically do not address the issue of whether the same conduct would constitute the unauthorized practice of medicine if Ashenbaum had not been at all times a registered nurse.

[2] See OAG 80-023, 2-97, 98. The nursing statute, R.C. 4723.02, now specifically authorizes nurses to assess health status and administer medication and treatment prescribed by a physician much as Ashenbaum did.